**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 23-cr-80006-RLR**

UNITED STATES OF AMERICA,

vs.

LINDA HORN,

      Defendant.

_____/

### DEFENDANT LINDA HORN'S SENTENCING MEMORANDUM AND REQUEST FOR IMPOSITION OF JOINTLY RECOMMENDED NON-CUSTODIAL SENTENCE

Defendant, LINDA HORN ("Mrs. Horn"), by and through the undersigned counsel, hereby presents this sentencing memorandum and request for imposition of the jointly recommended non-custodial sentence, specifically a term of probation, to aid this Honorable Court in its determination of the sentence to be imposed. Mrs. Horn also sets forth her position to the guideline calculations proposed in the Presentence Investigation Report ("PSI"). In support thereof, Mrs. Horn states as follows:

**Introduction**

In 1984, the Drug Enforcement Agency (DEA) made Quaaludes (methaqualone) a Federal Schedule 1 substance. At that time, Quaaludes became no longer legally available in the United States. Mrs. Horn, who is 70-years-old, was a user of Quaaludes throughout most of her adult life. The drug had been prevelant in her life and within her social circles for half a century. While Mrs. Horn never planned to become involved in the instant offense conduct, she acknowledges, that pre-offense, her lifestyle included the use of Quaaludes. This Memorandum will describe to the Court the personal circumstances of Mrs. Horn life which led to her involvement in the instant offense. In

no way does Mrs. Horn seek to excuse her behavior, she aims to present a fuller picture of her circumstances, including her biographical history, personal hardships, and additional factors that led to her making poor decisions, including the offense at hand.

In approximately 2012, Mrs. Horn almost lost her home to foreclosure.  She was a divorced mother of three children.  Alone, she was supporting herself and her three children.  An acquaintance sold Mrs. Horn and others in her social circle methaqualone.  After that individual died, Linda was approached about her access to methaqualone.  Thereafter, she became involved in the offense conduct by capitalizing on the situation as a means to support her and her children.

Concurrently, in 2012, Mrs. Horn's father was terminally ill and the family had caregivers and hospice workers. Mrs. Horn befriended one of the hospice workers and ended up traveling to Jamaica with this individual.  While in Jamaica, Mrs. Horn was looking for a methaqualone source and connected online with a man purportedly based in Cameroon.  Mrs. Horn was "ripped off" by the online methaqualone source from Cameroon.  However, the Cameroon source introduced her to a methaqualone source in Portugal. Mrs. Horn then made the deeply regrettable decision to purchase methaqualone from the source in Portugal.  Thereafter, the source began to sell methaqualone to Mrs. Horn.  The drug was sent through the mail.  In turn, Mrs. Horn sold the methaqualone to associates she described as successful people in her community.  During this time, Mrs. Horn regularly used the drug herself. The business grew year after year.  In 2014, she made $27,708, and the amount increased each year through 2021.  In total, the net proceeds of the offense was $1,334,214.37.

On November 17, 2021, law enforcement agents raided a home owned by Mrs. Horn's 91 year old mother, in Boca Raton. Mrs. Horn, a caregiver to her mother, would often stay in the home when she was in Florida. Mrs. Horn and her husband were handcuffed but not arrested.  Mrs. Horn's mother was present. As it turns out, during the course of the investigation, agents had placed a tracker

in one of the methaqualone shipments sent to Mrs. Horn.

## Background

On November 17, 2021, Mrs. Horn's shared home with her mother, was raided by law enforcement. She was not immediately arrested. After retaining counsel, Mrs. Horn cooperated with law enforcement and participated in a proffer session, wherein Mrs. Horn admitted her full involvement as described above.  On January 18, 2023, Mrs. Horn was charged by Information, with Conspiracy to Possess with Intent to Distribute a Controlled Substance in violation of 21 U.S.C. § 846. She was allowed to self-surrender on March 7, 2023. After self-surrendering, she was immediately released on pretrial supervision.  She has remained on pretrial supervision without incident as confirmed in Paragraph 6 of her PSI.

On May 12, 2023, Linda Horn entered a guilty plea to the sole count of the Information.  In the plea agreement, the parties agreed upon the quantity of drug involved, that Mrs. Horn is accountable for 9.177 Kilograms of converted drug weight. In the Plea agreement the parties mistakenly calculated the base offense level at 14 but have since filed a joint stipulation and agreement that Level 12 is the correct base offense level. Likewise, the parties agreed in the Plea agreement that Safety Valve relief is appropriate.  Further, the parties have agreed to jointly recommend a sentence of three years probation as sufficient and reasonable punishment in this case based on Linda Horn's cooperation and voluntary disgorgement of all criminal proceeds. In acknowledgment of her wrong doing, in May 2023, Mrs. Horn satisfied the full disgorgement amount of $1,334,214.37. Mrs. Horn respectfully requests that the Court adopt the joint recommendation and imposed a term of probation with appropriate conditions that will allow her to remain in the community while also more than adequately serving the retributive, punitive, protective, and deterrent goals of sentencing.

### Application of Sentencing Framework

This Court has broad discretion to craft an appropriate sentence for Linda Horn. The Sentencing Guidelines are "merely advisory, and the Court is not bound to apply the sentence indicated by the Guidelines so long as they are first determined and then carefully considered." *United States v. Gibson*, 442 F. Supp. 2d 1279, 1282 (S.D. Fla. 2006) (citing *United States v. Booker*, 543 U.S. 220, 260–61 (2005)).

### Objections to the PSI

The sentencing guideline computations presented in the draft PSI result in a total offense level of 10 and a criminal history category of I, for an advisory range of 6 to 12 months. These calculations place Mrs. Horn in Zone B, which allows for imposition of a non-custodial sentence. Following the disclosure of the draft PSI, the parties realized they utilized the wrong base offense level in structuring the plea agreement. Therefore, the parties filed with the Court a joint recommendation to correct the base offense level to a 12 instead of a 14, pursuant to § 2D1.1(c)(14). Should the Court adopt the stipulated revised base offense level, the total offense level will become an 8, for an advisory range of 0 to 6 months. The revised guideline calculations would place Mrs. Horn in Zone A, which allows for imposition of a non-custodial sentence.

In reviewing the PSI, Mrs. Horn noted a few biographical errors and respectfully requests a few limited corrections, which are not offense or guideline related. Specifically, in the Identifying Data section of the PSI, at page 3, Mrs. Horn requests her legal address be listed as 3655 Pebble Beach Road, Northbrook, Illinois, 60062. This is the legal address she utilizes on her Illinois driver's license. The Boca Raton address is her secondary residential address, which is a home owned by her mother.

As to Paragraph 41 of the PSI, Mrs. Horn clarifies there was an error in her medical records that mistakenly noted she has a mass on her bladder.  The bladder mass is actually a medical condition of her husband, Howard Horn. As to Paragraph 42 of the PSI, Mrs. Horn's prescription medication list has been updated to include amlodipine, 10 milligrams (mg), losartan, 50 mg, for hypertension; prednisone, 5 mg, hydroxychloroquine 200 mg, and leflunomide 20 mg, for rheumatoid arthritis; and valacyclovir, 500 mg, for cold sores.  She continues to take the other supplements as noted in the PSI.

As to the Assets chart at page 12 of the PSR, Mrs. Horn clarifies she has no interest in the Charles Schwab investment account.  That account belongs solely to her husband as it is money he inheritied.

## Application and Consideration of 18 U.S.C. § 3553 Factors

Based on the forthcoming analysis of Mrs. Horn's mitigating 18 U.S.C. § 3553(a) factors, we respectfully ask the Court to impose the sentence jointly recommended by the parties, three years' probation, which is a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in [3553(a)(2)]."

### "The nature and circumstances of the offense and the history and characteristics of the defendant." (18 U.S.C. § 3553(a)(1)):

#### A. Nature and Circumstances of the Offense

**Offense Conduct:**  Mrs. Horn is responsible for obtaining and distributing methaqualone. She has accepted full responsibility for her involvement in this offense, as detailed in his Factual Proffer, and she has received the standard guideline reduction for Acceptance of Responsibility, pursuant to § 3E1.1.

**Resolution of Criminal Liability and Acceptance of Responsibility:** Mrs. Horn did not put

the government to its burden and has sought a resolution of the criminal matter from an early onset.

**Cooperation with the Government:** Consistent with Mrs. Horn's acceptance of responsibility, her remorse for her involvement in this offense, and her guilty plea, she has and will continue to cooperate with the Government. She acknowledges and appreciates the positions taken by the Government during plea negotiations as memorialized in the written Plea Agreement.

### B. The History and Characteristics of the Defendant

#### Personal and Family History

Understanding the offense, and ultimately why a non-custodial sentence is appropriate, requires understanding Mrs. Horn's personal history. Linda Horn was born in the suburbs of Detroit, Michigan, to parents who were poor, and had lived through the Great Depression. Mrs. Horn's father was Sidney Smolinsky, who was reared in a conservative Jewish household. Sidney legally changed his last name to Small due to the religious stigma associated with his family's name. Sidney worked tirelessly as a traveling salesman and sold items such as encyclopedias, books, and jewelry. He became successful at his trade and eventually became the proprietor of a furniture store. Thereafter, the family's financial situation improved, and Sidney was able to move his family from the Detroit area to the suburbs of Chicago, Illinois. Mrs. Horn's father developed bone and prostate cancer in approximately 2011. Linda became his primary caregiver until he passed away in 2012. Marilyn (nee Gorstein) Small, age 93, is Mrs. Horn's mother. Sidney and Marilyn remained married until Sidney's death; however, their relationship was strained, and they fought often. This created a difficult home environment. At present, Marilyn, a lifelong homemaker, maintains residences in Boca Raton, Florida and Chicago, Illinois, but she primarily resides in Boca Raton. Since the death of her father in 2012, Mrs. Horn has been her mother's caregiver. At 93 years old, Marilyn Small is

in relatively good physical health but is suffering some mental decline.

On November 17, 2021, case agents appeared at Marilyn Small's residence in Boca Raton, Florida.  Mrs. Horn, her mother and her husband, were present for the search of the residence.  In the year and a half since the search, Mrs. Horn has been able to shield her mother from the true nature of the events that day and her instant criminal charges.  She feels the truth would emotionally devastate her fragile mother.

Mrs. Horn has one sibling, a sister, Gail Regenbogene, who lives in Skokie, Illinois.  Mrs. Horn and her mother are estranged from Gail. Even as children, the sisters shared a difficult relationship and were not close with one another.  Gail's first husband joined the family furniture business but his business practices ruined the company.   In the aftermath, Gail's husband committed suicide by gunshot in Marilyn Small's condominium in Chicago.  Gail's relationship with her sister and their mother never recovered and they are fully estranged.

Mrs. Horn graduated from high school in 1971.  She was not a good student and always struggled academically.  Nonetheless, she enrolled in college. Between 1971 and 1976, she attended four different colleges.  She had difficulty finding stability and a positive environment. Ultimately, Mrs. Horn earned a degree in elementary education. It was during her college years that she was exposed to various drugs, which she began to use at the approximate age of 20.  During high school and the beginning of her college years, Mrs. Horn experienced social anxiety and did not feel comfortable around the "fast crowd;" however, admittedly, she was drawn to those social circles. During her sophomore year of college, Mrs. Horn began to consume alcohol, experimented with marijuana, psychedelic mushrooms, LSD, and was given her first quaalude. Her use of marijuana and the psychedelic drugs only occurred on a few occasions and was never revisited.  However, her life was altered by the use of her first quaalude.  She recalls that her consumption of that first

quaalude as a landmark moment in her life because the drug made her feel comfortable and allowed her to enjoy social settings.  Thereafter, her use of quaaludes became routine, typically at least once a week.  This use pattern continued until she became pregnant with her first child in 1979.  She went on to have three children in four years, and then resumed use of the drug.  Mrs. Horn also sporadically used powder cocaine in her 20s and 30s. After her 30s, her drug abuse was limited to quaaludes, and she continued to use the drug until her arrest for the instant offense. Mrs. Horn is currently 70 years old, so, remarkably, she abused quaaludes over the course of 50 years. Notably, during the time period encompassing the instant offense, 2014 to 2021, Mrs. Horn was her own supplier, and weighed out each of her own capsules.  This was clearly a factor that contributed to the duration of the offense conduct.

At the age of 22, Mrs. Horn began dating Howard Horn.  Howard was a commodities broker who led a very fast and glamorous lifestyle. Howard began abusing alcohol and marijuana as a young teenager and moved on to cocaine and quaaludes in his 20s.  His drug abuse was chronic and problematic for decades.  While once successful as in the commodities industry, Howard eventually failed due to his substance abuse and mental health issues.  Howard has long been under the care of multiple mental health treatment providers and, he takes psychotropic medications. Individually, Linda and Howard Horn had problems, but together, they formed a deeply troubled, volatile relationship.  They married in 1977 and have three children together.  The relationship was rife with dysfunction, emotional and physical violence.  The couple divorced after 16 years together, and their divorce was described by Mrs. Horn as the "War of the Roses." Howard ultimately abandoned his wife and their children, both physically and financially.  Mrs. Horn became a single parent, began dating other men and continued to abuse quaaludes.  She had to turn to her parents for financial assistance. Howard went on to have a 15-year marriage to another woman. Linda Horn dedicated her

life to raising her children but even her relationships with her children went horribly wrong. The children were deeply traumatized.  The dysfunction of Linda and Howard Horn, individually and as a couple, led to complete estrangment from their children, once the children became adults.  Since the mid to late 2000s, Linda and Howard Horn have been fully estranged from their children.

Twelve years ago, Linda and Howard Horn reunited and, in 2016, they remarried. Mrs. Horn hoped the remarriage would be viewed positively by her children and end their estrangement. Her hopes did not come to fruition.  Her current legal problems have given Linda pause and an opportunity to reflect on her life.  She is coming to terms with the fact that her substance abuse and her relationship with Howard have had devastating impacts on her life.

At present, Mrs. Horn's mother is 93 years old and requires a caregiver.  Her husband, Howard, is also in poor health due to vascular problems.  He also struggles with mental health conditions for which he self-medicates with marijuana. Determined not to let the burden fall on anyone else, Mrs. Horn gets up every day to care for her mother and husband.  She maintains her mother's household as well as her own and manages the finances for both.

Mrs. Horn is highly regarded among her friends. Three character attestation letters are being submitted with this Memorandum. These testimonials were provided by a few of Mrs. Horn's closest friends. One friend, Bill Klein, described Mrs. Horn as "caring, loving, generous, and beautiful inside and out."  Aimee Tobias, a long term friend, wrote about their bond and the emotional support Linda Horn has provided her and others over the years:

> Linda is an incredible caretaker to her elderly mother and an extremely devoted wife to her husband Howard. I often wonder how she does everything so well and at the end of the day, she is still so concerned with others around her.

Moving forward, Mrs. Horn, at 70 years old, plans to continue caring for her mother and husband while living a quiet, peaceful, and lawful life, offering to the Court that she poses no risk

of future recidivism.

**Family Ties and Responsibilities**

Mrs. Horn has dedicated her life to caring for her children, father, mother, and Howard. Her father got ill in 2011, and she put her life on hold to help care for him. Since her father's death in 2012, Mrs. Horn has managed everything in her mother's life, including her finances and business responsibilities. To this day, Mrs. Horn shares an extremely close relationship with her 93-year-old mother. Since law enforcement executed a search warrant at her mother's home in 2021, Mrs. Horn has shielded her mother from the reality of that day. She worries every day knowing the information would emotionally devastate her mother. At present, her mother remains mobile but is beginning to experience the onset of dementia.  Mrs. Horn is her mother's primary caregiver, and she handles all her mother's business and household responsibilities.  Mrs. Horn also cares for her husband, Howard, who has recently undergone two medical procedures for arterial plaque blockages causing vascular complications in his legs.

Mrs. Horn appreciates that, in issuing a sentence, a court's primary focus must generally be on the offense and the offender, not on the defendant's family. Here, however, it should be recognized that she is the caretaker of her 93-year-old mother and the source of significant support for her spouse.

Effective October 27, 2003, the Sentencing Commission amended § 5H1.6 to limit the availability of departures for family ties and responsibilities. The new application note, § 5H1.6, comment. (n.1(A)(i)-(iii), instructs the court to consider the seriousness of the offense, the defendant's involvement in that offense, and the members of the defendant's family. Further, comment. (n.1(B)(i)-(iv) requires the court to consider if "the defendant's service of a sentence within the guideline range will cause a substantial loss of essential care-taking or essential financial support to his/her family," that "the loss of care-taking or financial support exceeds the harm ordinarily

incident to incarceration for a similarly situated defendant," that "the loss of care-taking or financial support is one in which no effective remedial or ameliorative programs reasonably are available," and that "the departure will effectively address the loss of care-taking or financial support." Mrs. Horn asks this Court to consider her family ties and responsibilities as an 18 U.S.C. § 3553(a)(1) sentencing factor in allowing the jointly recommended sentence to be imposed.

The Court clearly has the power to take these concerns into account at sentencing. *See, e.g.*, *United States v. Schroeder*, 536 F.3d 746, 755 (7th Cir. 2008) ("A defendant's extraordinary family circumstances can constitute a legitimate basis for imposing a below-guidelines sentence"); *United States v. Dominguez*, 296 F.3d 192, 199–200 (3d Cir. 2002) (district court erred in concluding it could not depart four levels in bank fraud case for defendant who resided with elderly parents, who were physically and financially dependent on her). Mrs. Horn asks that the Court do so here.

**Age and Physical Health**

Section 5H1.1 of the Guidelines provides that age "may be relevant in determining whether a departure is warranted, if considerations based on age, individually or in combination with other offender characteristics, are present to an unusual degree and distinguish the case from the typical case covered by the guidelines." While Mrs. Horn realizes that every defendant has his or her own health issues and recognizes courts may understandably be reluctant to grant a variance on these grounds, Linda, at 70 years old, is hardly the ordinary defendant in age or health and fits squarely into the language and purpose of § 5H1.1.

Only 2.8% of all federal inmates are over the age of 65. *See* Statistics: Inmate Age, Federal Bureau of Prisons (last updated January 21, 2023). There are not even statistics for the percent of inmates past age 70. The National Institute of Corrections defines prisoners 50 and older as

"elderly" and "aging," *Id.* Fifteen states specifically define an "older" inmate as 50 or older, and one state defines "older" as over 70. No matter the benchmark chosen, Mrs. Horn surpasses it. *See* Human Rights Watch, Old Behind Bars: The Aging Prison Population in the United States 4 (2012). In addition, given that only 6.9% of the prison population is female, and many inmates over 65 are serving lengthy sentences imposed at a younger age, Mrs. Horn would be an outlier among outliers as a 70-year-old female inmate just entering the system.

Mrs. Horn's health issues compound this problem. As documented in her medical records, Mrs. Horn has been diagnosed with rheumatoid arthritis, osteoporosis, hypertension, knee and toe conditions, and continuously monitored liver enzymes, which are periodically elevated. She is prescribed Losartan, amlodipine, losartan, prednisone, hydroxychloroquine, leflunomide, valcyclovir and diazepam.   In addition, in the early 1980s, Mrs. Horn was diagnosed with chronic stress and anxiety.  She recalls she originally saw a psychiatrist for the condition over 40 years ago. She participated in talk therapy in the early 2000s for a number of years.  She then became a patient of Dr. Thomas Rebori in Northbrooke, Illinois, who provided her with a prescription for Valium. In 2019, Dr. Rebori closed his practice.  Since that time, Mrs. Horn has received the Valium prescription from her internist, Dr. Martin Szanto, who is based in Chicago, Illinois.

Mrs. Horn's age and health, however, is more than just a compelling reason for mercy and compassion, but also is directly relevant to the analysis of 18 U.S.C. Section 3553(a)(2), strongly weighing in favor of a non-custodial sentence. *See United States v. McFarlin*, 535 F.3d 808, 811 (8th Cir. 2008) (upholding a sentence of three years' probation despite a guidelines range of 60 months based largely on defendants age, medical condition, and post-arrest rehabilitation, stating, "[t]he Guidelines also provide that, when considering a defendant's age, a court may consider alternative forms of incarceration for an elderly, infirm defendant that would be 'equally efficient'

as incarceration") (citation omitted). Mrs. Horn's personal risk of recidivism is remarkably low, as shown by her zero criminal history points and exemplary post-offense behavior, but is also inherent to her age and health. *See* U.S. Sent'g Comm'n (USSC), Older Offenders in the Federal System 43 (2022) (finding the recidivism rate for offenders over the age of 50 to be less than half of that of offenders under the age of 50); *United States v. Clay*, 483 F.3d 739, 745 (11th Cir. 2007) ("Both the Guidelines calculations and the sentencing factors of section 3553(a) require a judge to consider characteristics of the defendant and the offense that make it more or less likely that the defendant will reoffend."); *United States v. Green*, 2007 WL 869725, at *2 (S.D. Ohio Mar. 20, 2007) ("[D]istrict courts have routinely considered a defendant's age as part of their analysis on the grounds that older defendants exhibit markedly lower rates of recidivism compared to younger defendants[.]").

District courts across the country have recognized the unique characteristics of older offenders, with offenders over the age of 50 twice as likely to receive probationary sentences compared to all other offenders. *See* Older Offenders in the Federal System, at 31. In fact, more than 40 percent of offenders 70 and older received probation, a fine, or other alternative to incarceration in fiscal year 2021. *Id.* at 32. Overall, offenders over 65 were nearly as likely to receive a variance (48.8% and 49.1%) as they were to receive a sentence under the Guidelines Manual. *Id.* at 38.

Simply put, Linda Horn's age and health, and the relationship between age and the purposes of punishment outlined in Section 3553(a)(2), make a non-custodial sentence appropriate in her case.

### C.  The Need for the Sentence to Reflect the Seriousness of the Offense, Promote Respect for the Law, Provide Just Punishment and Deterrence

**Pending Amendmant for Certain Zero-Point Offenders, § 4C1.1**

Published April 27, 2023, in the latest of the United States Sentencing Commission's amendment cycle, sent to Congress May 1, 2023, and to become effective November 1, 2023, is a change that effects offenders who did not receive criminal history points from Chapter Four. Part A, Subpart 1, provides for an adjustment for certain offenders with zero criminal history points. Subpart 1 of Part B of the amendment creates a new Chapter Four guideline at §4C1.1 (Adjustment for Certain Zero-Point Offenders). In relevant part, this amendment provides:

§4C1.1. Adjustment for Certain Zero-Point Offenders

(a) ADJUSTMENT—If the defendant meets all of the following criteria:

(1) the defendant did not receive any criminal history points from Chapter Four, Part A;

(2) the defendant did not receive an adjustment under §3A1.4 (Terrorism);

(3) the defendant did not use violence or credible threats of violence in connection with the offense;

(4) the offense did not result in death or serious bodily injury;

(5) the instant offense of conviction is not a sex offense;

(6) the defendant did not personally cause substantial financial hardship;

(7) the defendant did not possess, receive, purchase, transport, transfer, sell, or otherwise dispose of a firearm or other dangerous weapon (or induce another participant to do so) in connection with the offense;

(8) the instant offense of conviction is not covered by §2H1.1 (Offenses Involving Individual Rights);

(9) the defendant did not receive an adjustment under §3A1.1 (Hate Crime Motivation or Vulnerable Victim) or §3A1.5 (Serious Human Rights Offense); and

(10) the defendant did not receive an adjustment under §3B1.1 (Aggravating Role) and was not engaged in a continuing criminal enterprise, as defined in 21 U.S.C. § 848;

decrease the offense level determined under Chapters Two and Three by 2 levels.

In addition to adding an adjustment for zero-point offenders, the Sentencing Commission has adopted an amendment to the application notes for §5C1.1 in order to promote more sentences other than sentences of imprisonment for such offenders. This new note 10 provides:

Zero-Point Offenders.-

(A) Zero-Point Offenders in Zones A and B of the Sentencing Table.—If the defendant received an adjustment under §4C1.1 (Adjustment for Certain Zero-Point Offenders) and the defendant's applicable guideline range is in Zone A or B of the Sentencing Table, a sentence other than a sentence of imprisonment, in accordance with subsection (b) or (c)(3), is generally appropriate. See 28 U.S.C. § 994(j).

(B) Departure for Cases Where the Applicable Guideline Range Overstates the Gravity of the Offense.—A departure, including a departure to a sentence other than a sentence of imprisonment, may be appropriate if the defendant received an adjustment under §4C1.1 (Adjustment for Certain Zero-Point Offenders) and the defendant's applicable guideline range overstates the gravity of the offense because the offense of conviction is not a crime of violence or an otherwise serious offense. See 28 U.S.C. § 994(j).

Imposition of the sentence recommendation contained in the written plea agreement, a three-year term of probation, would be consistent with these amendments to the sentencing guidelines that have yet to take effect.

**Conclusion**

Mrs. Horn has accepted responsibility for her involvement in this offense. She accepts responsibility for where she is at this time in her life. Based upon the facts and factors set forth above, Mrs. Horn respectfully requests this Court impose three-year term of probation in this case, as jointly recommended by the parties.

Mrs. Horn and counsel thank this Court for considering our Sentencing Memorandum.

I HEREBY CERTIFY that a true copy of the foregoing has been electronically filed with the Clerk of Court using CM/ECF this 14th day of August, 2023.

/s/ Michael A. Gottlieb
_____
Michael A. Gottlieb, Esquire
Michael A. Gottlieb, P.A.
1311 SE 2nd Avenue
Ft. Lauderdale, Florida 33316
mike@mgottlieblaw.com
Phone: (954) 462-1005
Fax: (954)463-9869
Florida Bar No.: 981133

APRIL 10, 2023

## BILL KLEIN
## 20191 East Country Club Drive
## Miami, Florida 33180

To: The Honorable Robin L. Rosenberg

Re: U.S.A v. Linda Horn

Case No. 23 -cr – 80006 – Rosenberg

Dear Judge Rosenberg:

I wanted to write this letter to allow you to know and understand that Linda Horn, my friend for life is a beautiful woman who has been a great friend to myself and others in her life. My name is Bill Klein. I am a retired 69-year-old former Television Producer from New York City, now residing in Aventura, Florida.

I first met Linda on September 10, 2001. We were both sitting at the bar waiting for our table at a Rush Street Restaurant as we waited for our party to arrive for dinner. As our party were both late, we had some interesting conversations about our lives and the discussion seemed to be so enjoyable that we exchanged phone numbers. Over the years we stayed in touch, so much so that I came to learn that Linda was caring, loving, generous and beautiful inside and out. The following day when 9/11 hit The World Trade Center, Linda called me and knowing I was from New York, was truly concerned if anyone I know was okay on that shocking day.

I knew at that moment that this woman is something very special. We have stayed in touch ever since. Linda never forgot my Birthday, always checking in to see how I was and when I was diagnosed for Bladder Cancer in March 2005, Linda came to visit me in Mt. Sinai Hospital.

There are always certain people that one meets in their life that you know are very special and Linda Horn is so very special and will be for the rest of my life.

Whenever Linda came to Boca Raton Florida, we would meet.  When we met last year Linda told me she was facing some serious legal problems and needed legal counsel, I recommended she contact Michael Gottlieb to examine her case.

I respectfully request that when you have Linda Horn in your Courtroom, that you are examining a woman who is kind to people and would always be there for a friend.

With everything happening in today's world I consider Linda Horn a "Very Special Person."

I hope that this will help during a critical time in Linda's life.

Thank You

Respectfully,

Bill Klein

Denise Kornylak
22575 Island Lakes Drive
Estero, FL 33928
dkornylak@gmail.com

April 23, 2023
The Honorable Robin L. Rosenberg
Re" USA vs. Linda Horn
Case No. 23-cr-8006 – Rosenberg

Dear Judge Rosenberg:

Linda Horn and I met at the wedding of a mutual friend in July, 2018.

Although I am now retired and reside full time in Florida, we found that we have a lot of shared experiences and people in common from the options and commodities floors in Chicago. She calls frequently to check in and see how I am doing, making sure to follow up on any medical conditions. We chat about many subjects. She never misses a special occasion or birthday.

When it recently came up that she was diagnosed with rheumatoid arthritis, I was very concerned and we spoke frequently about symptoms and possible treatments, as I was diagnosed many years ago with the same condition. I was under a lot of stress at the time, as my sister had just been diagnosed with lung cancer. Being aware of her legal situation, I explained that if RA was not genetically in her family, that is often brought on by stress. I am convinced that her condition was brought on by the stress of her legal situation. I have made suggestions of conversations she can have with her physician to get her pain and condition under control.

Although neither situation is easy, I am hopeful that a resolution of her legal issues will alleviate her physical pain, gain control of her newly diagnosed condition and especially alleviate the stress of her legal situation.

We are supportive and will continue to be supportive of each other.

Sincerely,

Denise Kornylak

April 25, 2023

Aimee Tobias
5216 East Angela Drive
Scottsdale, Arizona 85254

TO: Honorable Robin L. Rosenberg
RE: Linda Horn
CASE number 23-cr-80006-Rosenberg
     Dear Judge Rosenberg,

I want to share my relationship with Linda Horn.
We met approximately 20 years ago when I was living
back in Chicago. Linda and I had many mutal friends
and many common interests. At the time I was
a commodity trader at th Chicago Board of Trade.
I ran a desk for Goldberg Bros. And also was an
order filler in the grain pit. I retired from being
a floor trader and went into the jewelery business
specializing in watches which I currently still do
sell.
    The moment we met not a day has gone by we
haven't spoken at least 10 times a day. I wake up
to her voice and often go to sleep saying good night.
Linda is an extremely loyal friend and a very caring
individual.
    My husband has recently passed away from cancer.
We were practically living at Mayo Clinic in Phoenix Az.
Linda was there every step of the way. From the
initial diagnosis to the final evening he closed his
eyes. I would cry on her shoulder often, Linda
always assured me to stop crying and in time

everything will be okay. Linda always made time for me no matter what she was doing. Linda put me first. I could never have gotten through that horrific dark time of my life without Linda's giant heart and her words of wisdom.

Linda is an incredible caretaker to her elderly mother and an extremely devoted wife to her husband Howard. I often wonder how she does everything so well and at the end of the day, she is still so concerned with other around her.

Life has many avenues and challenges. At times we get caught up in the moment and make a poor decision. I feel Linda has proven to loved ones and unique individuals around her that she deserves a second chance. Society needs more people like Linda Horn.

Thank you so much for your kindness,

Aimée Tobias

Aimée Tobias